**RYDER TRUCK LINES, INC., Petitioner,**

v.

**Peter J. BRENNAN, Secretary of Labor, Respondent.**

**No. 73-3341.**

United States Court of Appeals, Fifth Circuit.

July 18, 1974.

Rehearing Denied Sept. 13, 1974.

J. P. Jones, Allan P. Clark, Jacksonville, Fla., for petitioner.

William S. McLaughlin, Executive Sec., Occupational Safety & Rev. Comm., Washington, D. C., Norman H. Winston, Associate Regional Sol., U. S. Dept. Of Labor, Birmingham, Ala., Baruch A. Fellner, Counsel for Regional Litigation, U. S. Dept. of Labor, Stephen F. Eilperin, Karen K. Siegel, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before DYER and MORGAN, Circuit Judges, and KRAFT, District Judge.

KRAFT, District Judge:

The employer, Ryder Truck Lines, Inc. (Ryder), has petitioned, pursuant to § 11(a) of the Occupational Safety & Health Act of 1970 (Act), 29 U.S.C. § 651 et seq., for review of a final order of the Occupational Safety & Health Review Commission (Commission), issued on August 16, 1973. The order determined that Ryder had committed a violation of 29 C.F.R. 1910.132(a) for which no penalty was applicable. Petition will be denied.

Ryder is an interstate common carrier, which operates 85 truck terminals and has more than 1000 employees. One of its terminals, in Birmingham, Alabama, is the site of the charged violation. Of the 260 employees at the Birmingham terminal, approximately 117 perform duties on the loading docks each week. As many as 40 workmen are employed there during the day shift. This terminal consists of a one-story building with offices in the front or east side. Behind the offices is a rectangular freight platform surrounded on three sides by 88 doors, each 9 feet wide and about 2 feet apart, and a continuous loading dock.

Basically the dock workers' job consists of transferring freight from one motor truck to another or from a designated dock area to a truck or vice versa. The freight handled by the workers is far from uniform; the size, shape, weight and packaging of the pieces varies widely. Motors, machinery and occasionally pipe are handled, in addition to packaged goods. The only weight restriction imposed by Ryder is that its men and equipment be able to move the shipment. Individual workmen, too, lift, carry and deposit whatever loads they can handle, at times as much as one hundred pounds apiece. Four wheeled pushcarts and tow motors (gasoline powered forklifts) are also utilized to facilitate freight transfer. The pushcarts are used to move the smaller packages, which are loaded and unloaded by hand, to trucks or to stacks approximately 7 feet high. The tow motors are employed to transfer palletized freight and/or freight which is too heavy to lift manually.

**Pursuant to an employee's complaint** an OSHA compliance officer inspected the Birmingham terminal on December

**232**

13, 1971. The inspection consisted of observation of the workers and their attire as they performed their normal tasks and an examination of Ryder's injury record, especially noting the foot and toe injuries.

The footwear worn by the workers on the dock ran the gamut from substantial workshoes to loafers, slippers and other footwear of soft, pliable materials. The injury log revealed that there had been as many as ten reported foot and toe injuries to dock workers in the five years preceding the inspection.

As a result of the detailed inspection, the Secretary of Labor, on December 23, 1971, cited the petitioner for a non-serious violation of § 5(a)(2) of the Act, because "foot protection was not universally used on the loading and unloading docks where foot hazardous material is frequently handled".[1]

■ Ryder was not fined, but was ordered to abate, which imposed no financial burden. Ryder timely employed and exhausted the remedies available, without success, and this petition for review followed. We are persuaded that there is substantial evidence in the record to support the Commission's conclusion that the Act was violated, 29 U.S.C. § 660(a) and that Ryder's other contentions lack merit and so deny the petition.

■ The substantial evidence standard must be applied in any judicial review of decisions of an administrative

agency under this Act. 29 U.S.C. § 660(a). The Supreme Court, in Universal Camera Corp. v. Labor Bd., 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951), has defined "substantial evidence", as follows:

" 'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' . . . Accordingly, it 'must do more than create a suspicion of the existence of the fact to be established . . .' "

The record here reveals that: the work area, necessarily somewhat limited and cramped by the width of the loading docks or platforms, was a place of heavy traffic, with burdened workers, push-carts and tow motors moving constantly in intricate patterns to and from their respective destinations; the duty of the dock workers was manually to lift, carry, load, unload, pile, deposit and transfer freight, some of which weighed as much as 100 pounds; the workers customarily wore footwear other than protective workshoes; Ryder was aware that many of its dock workers did not wear protective workshoes, but wore whatever their fancies dictated; the medical records of Ryder disclose that there had been at least 10 reported foot and toe injuries to dock workers in the five year period preceding the citation.

The applicable regulation requires protective equipment,

---

1. Section 5(a)(2) of the Act, 29 U.S.C. 654(a)(2), requires each employer affecting commerce to "comply with occupational safety and health standards promulgated under this chapter." 29 C.F.R. 1910.132, the relevant safety standard, appears as the first section of a subpart entitled "Personal Protective Equipment", and provides, in pertinent part,

"(a) *Application.* Protective equipment, including personal protective equipment for eyes, face, head and extremities, protective clothing, respiratory devices, and protective shields and barriers, shall be provided, used, and maintained in a sanitary and reliable condition wherever it is necessary by reason of hazards or processes or environment, chemical hazards,

radiological hazards, or mechanical irritants encountered in a manner capable of causing injury or impairment of the function of any part of the body through absorption, inhalation or physical contact.

(b) *Employee-owned equipment.* Where employees provide their own equipment, the employer shall be responsible to assure its adequacy, including proper maintenance, and sanitation of such equipment.

(c) *Design.* All personal protective equipment shall be of safe design and construction for the work to be performed." The Secretary also cited Ryder for four other non-serious violations (App. 1-2, 5). None of these violations is presently before the Court.

"Wherever it is necessary by reason of hazards of process or envionment . . . encountered in a manner capable of causing injury or impairment of the function of any part of the body through absorption, inhalation or physical contact." 29 C.F.R. 1910.132 (a).

The legislative history of the statute reveals that its declared purpose is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). It is noteworthy that the Act does not establish as a *sine qua non* any specific number of accidents or any injury rate. Hence, Ryder's reliance on "only 10 injuries in five years" is misplaced. Moreover, the Act specifically encompasses non-serious violations, i. e., violations which do not create a substantial probability of serious physical harm. 29 U.S.C. § 666(g)(j). Avoidance of minor injuries, as well as of major ones, was intended to be within the purview of this liberal Act.

Ryder places great reliance on Hodgson v. Grayson Lumber Company, Inc., OCHRC Docket No. 793, 2 CCH ¶ 15,208 (ALJ September 12, 1972), insisting that that factual context is "strikingly similar" to the case *sub judice* and, though not controlling, ought to be persuasive. We reject this contention for several reasons. In the instant case, manual lifting and moving of freight is the sole job of the dock workers; in *Grayson*, it was ancillary to the primary function of the workers. The limited quarters were lacking in *Grayson*. In *Grayson*, there was no evidence adduced evincing a cognizance on the part of the employer of the absence of proper footwear, and, finally, there had not been one reported foot or toe injury in 20 years.

■ Ryder also claims that 29 C.F.R. § 1910.132(a) is constitutionally void for vagueness, because it sets up no ascertainable standard of conduct consonant with due process of law. Although the regulation may not be a model of perfect precision, we do not believe that its imprecision renders it constitutionally infirm.

■ In considering the claimed vagueness of the regulation, we are mindful of two critical factors: first, this regulation involves remedial civil legislation in contradistinction to criminal legislation; secondly, the rights guaranteed by the First Amendment are not remotely related to this case. Hence, we must consider the statute "not only in terms of the statute 'on its face' but also in light of the conduct to which it is applied." United States v. National Dairy Corp., 372 U.S. 29, 36, 83 S.Ct. 594, 600, 9 L.Ed.2d 561 (1963). The regulation appears to have been drafted with as much exactitude as possible in light of the myriad conceivable situations which could arise and which would be capable of causing injury. Moreover, we think inherent in that standard is an external and objective test, namely, whether or not a reasonable person would recognize a hazard of foot injuries to dockmen, in a somewhat confined space, from falling freight and the rapid movement of heavy mechanical and motorized equipment, which would warrant protective footwear. So long as the mandate affords a reasonable warning of the proscribed conduct in light of common understanding and practices, it will pass constitutional muster. United States v. Petrillo, 332 U.S. 1, 4, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947). In addition, the Commission when considering the case did apply the "reasonable man" test. Although that standard[2] is one of the most nebulously defined concepts in the law, it has been, and in all probability will remain, one of the rudimentary precepts of our law. We find uncon-

**2.** Negligence is the omission to do something which a reasonable man, guided by those considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do, with reference to the situation and knowledge of the parties under all the attendant circumstances. Parrot v. Wells Fargo & Co., 82 U.S. 524, 15 Wall. 524, 21 L.Ed. 206 (1872).

vincing Ryder's argument that it did not and could not know what was required by the Act, in light of the history of foot and toe injuries compiled in its logs and the safety shoe program it had initiated *sua sponte*. That was precisely the remedial action ordered by the Commission. It may well be that some hazards are unpreventable, particularly if an employee's conduct is willfully reckless or so unusual that the employer could not reasonably prevent the existence of the hazard which his behavior creates. See National Realty & Constr. Co. v. Occupational Safety & Health Review Comm'r, 160 U.S.App.D.C. 133, 489 F.2d 1257 (1973). This is not such a case.

Petition denied.