**LEE WAY MOTOR FREIGHT, INC., Petitioner,**

v.

**SECRETARY OF LABOR, Respondent.**

No. 74–1236.

United States Court of Appeals, Tenth Circuit.

Argued Nov. 15, 1974.

Decided Feb. 19, 1975.

Ben L. Burdick, Oklahoma City, Okl. (Charles W. Mooney, Jr., and Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., with him on the brief), for petitioner.

Anthony J. Steinmeyer, Atty., Dept. of Justice (Carla A. Hills, Asst. Atty. Gen., New York City, Stephen F. Eilperin, Atty., Dept. of Justice, and William J. Kilberg, Sol. of Labor, Benjamin W. Mintz, Associated Sol. for Occupational Safety and Health, Michael H. Levin, Stephen C. Yohay, and Judith Burghardt, Attys., Dept. of Labor, of counsel, with him on the brief), for respondent.

Before BREITENSTEIN, McWILLIAMS and DOYLE, Circuit Judges.

McWILLIAMS, Circuit Judge.

This case arises under the Occupational Safety and Health Act of 1970, hereinafter referred to as the Act. 29 U.S.C. § 651 et seq. Lee Way Motor Freight filed in this court a petition to review an order of the Occupational Safety and Health Review Commission, which order held that Lee Way committed a nonserious violation of 29 U.S.C. § 654(a)(2) by violating the standard of 29 C.F.R. § 1910.22(c) (1972). Jurisdiction is based on 29 U.S.C. § 660. That statute provides, among other things, that the findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. Or, as was said in Brennan v. Occupational Safety & Health Comm'n, 501 F.2d 1196 (7th Cir. 1974), "The Occupational Safety and Health Review Commission is presumed to have technical expertise and experience in the field of job safety [and] a court must, therefore, defer to the findings and analysis of the Commission unless such findings are without substantial basis in fact."

The standard here involved states that "covers and/or guardrails shall be provided to protect personnel from the hazards of open pits, tanks, vats, ditches, etc." 29 C.F.R. § 1910.22(c) (1972). Our study of the instant record leads us to conclude that the finding of the Commission that Lee Way violated the aforesaid standard is supported by substantial evidence. And as a corollary of that finding, we also agree with the Commission that the standard in question does apply to Lee Way. Let us first examine the particular phase of Lee Way's operation to which the Commission applied the standard.

Lee Way is a large interstate motor carrier and employs about 150 persons at its freight and terminal facility in Oklahoma City, Oklahoma. The terminal consists of a trailer shop, a wash rack building, and an inbound service department where tractor-trailer maintenance work is performed. We are here concerned with this vehicle maintenance area.

The service building contains four parallel traffic lanes which are separated by building supports, heating and ventilation ducts, trash barrels, and circular parts-storage trays. Within each lane is a vehicle maintenance pit which is 31 inches wide, 4 feet deep, and 100 feet long and is sufficiently long to accommodate two tractor-trailer rigs simultaneously. The distance between the maintenance pits is 19 feet, 5 inches.

Lee Way's practice is for its drivers to park their incoming trucks about 100 feet from this service area, and for tractor mechanics to then. drive the trucks into position over the maintenance pits. Men then enter the pits by stairways on either end. Service on each truck takes approximately 20 minutes and is performed by teams of three men who work both in the pit and alongside it. The service work consists primarily of visual

inspection underneath the truck, brake adjustments, oil and grease work, and minor repairs.

The service area is in operation 24 hours a day and has been closed only one day in the two years since it opened. The number of trucks serviced averages between 100 to 120 per day. The maximum capacity of the four service pits is eight trucks but rarely are there as many as seven trucks in the area at one time. Occasionally one or more of the service pits has not been in use, and therefore has been completely uncovered, for as long as two hours.

The concrete floor of the service area is painted with a nonskid paint. Occasionally, however, grease and oil are spilled on the floor near the edge of the pits. And in bad weather, snow, ice, or rain frequently drop from the trucks after they have been driven over the pits. In addition, a few tools may also be lying on the floor near the pits. In the course of their work, Lee Way employees routinely step over the 31-inch pits rather than walk around them.

A compliance officer from the Department of Labor inspected Lee Way's terminal facility and as a result of such inspection cited Lee Way for 28 nonserious violations of the Act. One such citation was for not having covers or guardrails for the maintenance pits. The proposed penalty for this particular violation was $30. It should be noted that the Act provides for three grades of violations, depending upon the "level of gravity" of the particular violation. Those gradations are de minimis violations, on the one hand, then nonserious violations, and finally serious violations. 29 U.S.C. § 666.

Lee Way did not contest 24 of these citations, claiming that it remedied these particular situations after receiving the citations therefor. However, Lee Way did contest the remaining four citations, including the one relating to the installation of covers or guardrails for the maintenance pits. In this proceeding we are concerned only with this one citation.

A hearing was held before an administrative law judge, who vacated the citation here in question on the ground that the Secretary of Labor had failed to show that Lee Way's open maintenance pits presented any safety hazard. On review, the Commission reversed the administrative law judge and reinstated the citation.

The Review Commission found that the standard in question did apply to Lee Way's vehicle maintenance area, and that Lee Way was in violation thereof. The Review Commission also held that the Secretary was not required to show that a hazard existed in order to show noncompliance with the standard, since "the standard by its plain terms assumes the existence of a hazard with regard to open pits and does not require that a hazard be proven before noncompliance with its terms is established." The Review Commission did find, however, that the violation in question had a direct and immediate relationship to occupational safety and health, since the lack of covers or guardrails exposed Lee Way's employees to the "hazard" of tripping, slipping or falling into the open service pits. It was on this basis that the Review Commission determined that the violation was nonserious rather than de minimis. The vote of the Review Commission reversing the administrative law judge was two-to-one. The dissenting Commissioner, however, dissented on a ground that is not urged in this court.

As stated above, our study of the matter convinces us that the Review Commission was correct in its determination that the standard here involved did apply to Lee Way's vehicle maintenance pits, and that there was a nonserious violation of such standard. Before looking at the standard here sought to be invoked against Lee Way, let us examine briefly the overall purpose of the Act.

The declared purpose and policy of the Act is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). *See also* Brennan v. Occupational Safety & Health Review

Comm'n, 505 F.2d 869 (10th Cir. 1974). Accordingly, each employer shall comply with the occupational safety and health standards promulgated under the Act to the end that employees shall be furnished employment and a place of employment free from recognized hazards that cause or are likely to cause death or serious harm to such employees. 29 U.S.C. § 654(a). To carry out the Act's purpose, the Secretary was required to promulgate as an occupational safety or health standard "any national consensus standard and any established Federal standard." 29 U.S.C. § 655(a). Pursuant to this authority, the Secretary promulgated 29 C.F.R. § 1910.22(c) (1972), the regulation here involved. Let us now examine that standard in context.

This standard appears in the regulations under Subpart D, captioned "Walking-Working Surfaces," and reads as follows:

"§ 1910.22 *General requirements.* This section applies to all permanent places of employment, except where domestic, mining, or agricultural work only is performed. \* \* \*

\* \* \* \* \* \*

"(c) *Covers and guardrails.* Covers and/or guardrails shall be provided to protect personnel from the hazards of open pits, tanks, vats, ditches, etc."

■■ We shall first consider whether the aforesaid standard has application to Lee Way's vehicle maintenance pits. Lee Way argues that a "pit is a pit" approach is too simplistic, and that the legislative history of this standard indicates the standard was not meant to be applied to vehicle maintenance pits. Thus, inquiry into such history is in order. A standard promulgated under the Walsh-Healey Act, namely, 41 C.F.R. § 50–204.3 (1970), would appear to be the forerunner of the standard with which we are here concerned, and that standard reads as follows:

"Material handling and storage

\* \* \* \* \* \*

"(g) Covers and/or guardrails shall be provided to protect personnel from the hazards of open pits, tanks, vats, ditches, etc."

The Walsh-Healey Act of 1936 imposed safety and health standards on those holding government contracts for materials, supplies, articles or equipment in excess of $10,000. The Act seeks to impose safety and health standards on those engaged in interstate commerce, and hence has a much broader coverage than the Walsh-Healey Act. The Act itself refers to the Walsh-Healey Act and declares that standards promulgated under the Walsh-Healey Act shall be deemed to be occupational safety and health standards. 29 U.S.C. § 653(b)(2). Additionally, the Secretary of Labor was empowered to promulgate by rule as an occupational safety or health standard *any* national consensus standard, and *any* established federal standard. 29 U.S.C. § 655(a). Pursuant to this authority, the Secretary of Labor, acting on the premise that 41 C.F.R. § 50–204.3 (1970) was an established federal standard, promulgated the standard with which we are here concerned, namely, 29 C.F.R. § 1910.22(c) (1972).

The Act further provides that any interested party may file objections to a proposed standard, and provision is made for a temporary variance from a standard. 29 U.S.C. § 655(b). The record does not indicate that Lee Way objected to the standard when proposed, nor has it requested a variance. Rather, it is Lee Way's basic position that the standard simply has no applicability to its vehicle maintenance pits. In this regard Lee Way points out that 41 C.F.R. § 50–204.3 (1970) was an established federal standard only insofar as it related to the handling and storage of materials, and that accordingly 29 C.F.R. § 1910.-22(c) (1972) is also subject to such limitation, notwithstanding the fact that such standard appears under a heading entitled "Subpart D-Walking-Working Surfaces." In other words, as we understand it, Lee Way does not contend that it is totally immune from the standard

of 29 C.F.R. § 1910.22(c) (1972), but rather that this standard applies only to such part of its operation as involves the handling and storage of material, and this does not include its inbound service department. We do not agree with this line of reasoning.

The established federal standard related to the necessity for either covering or providing guardrails for open pits. There is little doubt but that it was the legislative intent that the Secretary of Labor could promulgate by rule the standard now embodied in 29 C.F.R. § 1910.22(c) (1972). Congress itself adopted the Walsh-Healey standards as occupational safety and health standards of general application. 29 U.S.C. § 653(b)(2). And in our view the standard in question is not limited in its application to areas where there is a handling and storage of material, but it has applicability, as the standard itself provides, to "Walking-Working Surfaces." Indeed the principal purpose to be served by adopting standards established under previous federal statutes as standards of the Act was to extend protection to many workers who had not been covered by previous standards.

■ Lee Way also contends that the standard does not apply to its vehicle maintenance pits for a variety of other reasons, none of which in our view has merit. For example, Lee Way suggests that we are not really concerned with a "pit," and hence the standard is inapplicable. In connection with this argument Lee Way states that actually the *bottom* of the vehicle maintenance pit is itself the only working surface, and that the rest of the service area constitutes a "platform." Hence, says Lee Way, the standard on "platforms," and not "pits," is the proper one. This line of reasoning is to us most tenuous and unrealistic. In any event, it is sufficient to state that there is substantial evidence in the record to support the Review Commission's finding that we are here dealing with a "pit," and not a "platform."

■■ Lee Way then contends that if the service maintenance pit be a "pit," it is not an "open pit," as is mentioned in 29 C.F.R. § 1910.22(c) (1972). This argument is based on the fact that only vehicle maintenance personnel are allowed in the service maintenance area, and outsiders are kept out of this particular building. We believe this argument is also without merit. The purpose of the standard is of course to protect the employees who are working in the area, not those who are barred from the area. They need no protection. And the standard itself suggests that a "pit" is an "open pit" unless there be appropriate cover or guardrails. Without further consideration of the wide variety of reasons here advanced by Lee Way as to why the standard should not be applied to its vehicle maintenance pits, we would simply state that none of them has merit, and that we agree with the conclusion of the Review Commission that the standard applies.

Lee Way next argues that there can be no violation of the standard unless a hazard has been proved by the Secretary, and that none was proved. In fact, asserts Lee Way, its evidence that there had been no accidents since the pits were installed some two years ago showed that there was no hazard.

■ The Secretary contends, and the Review Commission so held, that a hazard, as such, need not be shown in order to show noncompliance with this particular standard. The standard presupposes the obvious, namely, that an open unguarded pit necessarily presents the hazard that someone may fall into it. We agree. However, it is conceded that a mere noncompliance which has no direct or immediate relationship to safety or health is only a de minimis violation, which permits the Secretary to issue a notice, but not a citation. 29 U.S.C. § 658(a). So, in order to warrant the issuance of a citation based on a nonserious violation, as in the present case, there must be a showing that the noncompliance with the standard had a direct and immediate relationship to the employees' safety and health. In this connection, as mentioned above, the Re-

view Commission did find such relationship and determined that the hazard of someone tripping, slipping, or falling into the open service pit had a direct connection to employees' safety. In our view the record permits the drawing of such an inference, even though no one has yet fallen. One purpose of the Act is to prevent the first accident. In this regard, *see* Ryder Truck Lines, Inc. v. Brennan, 497 F.2d 230, at 233 (5th Cir. 1974), where the following pertinent language appears:

> "The legislative history of the statute reveals that its declared purpose is 'to assure so far as possible every working man and woman in the Nation safe and healthful working conditions.' 29 U.S.C. § 651(b). It is noteworthy that the Act does not establish as a *sine qua non* any specific number of accidents or any injury rate. Hence, Ryder's reliance on 'only 10 injuries in five years' is misplaced. Moreover, the Act specifically encompasses non-serious violations, i. e., violations which do not create a substantial probability of serious physical harm. 29 U.S.C. § 666(g)(j). Avoidance of minor injuries, as well as of major ones, was intended to be within the purview of this liberal Act."

The fact that Lee Way had a favorable accident record may properly be considered, as it was, in determining the gravity of the violation and the appropriate sanction therefor. In the instant case, Lee Way's good record was reflected in the fact that it was cited for only a nonserious violation, as opposed to a serious violation, and with a recommended penalty of only $30.

In determining that the cover or guardrail standard applies to Lee Way's vehicle maintenance pits, it is not our function to specify what type of cover or guardrail is most appropriate. That is where the Commission's expertise comes into play. We need only find, as we do, that such protective device is sufficient to eliminate the existing hazard and is, therefore, required.

The Commission's order is affirmed.

BREITENSTEIN, Circuit Judge (dissenting).

I dissent. The regulation, 29 CFR 1910.22(c), says that "covers and/or guardrails shall be provided to protect personnel from the hazards of open pits, tanks, vats, ditches, etc." We are concerned with a maintenance pit for servicing a fleet of tractors-trailers. Nothing in the regulation, or in the history behind the regulation, equates "maintenance pit" with "open pit." Maintenance pits are included in the regulation, if at all, by the "etc.", a symbol of doubtful significance. I suggest that if the regulation is to apply to maintenance pits, it should specifically mention them.

The Law Judge found:

> "4. The Respondent in its specially constructed inbound inspection area operated four unguarded lubrication, inspection and safety pits, which presented low level of gravity type hazards and where no personal injuries attributed to the unguarded pits were reported during its two years of existence.
>
> 5. There was no showing by the evidence of a general condition, industry-wide, of lost time accidents directly related to this specific type of operation."

The Law Judge concluded:

> "4. The complainant has failed to sustain the burden of proof that failure to provide covers or guardrails around the four lubrication, inspection and safety pits in the inbound inspection area by the Respondent was a violation of standard 29 CFR 1910.-22(c) item 4 of the amended citation issued June 16, 1972."

Review of the Law Judge's decision was heard by a panel of three Commissioners, one of whom, the Chairman of the Commission, said in dissent:

> "Considering the overall conditions existing in the respondent's workplace, the area director who issued the citation concluded that the only feasible way for the respondent to comply with the standard was to use nylon cable. Since the standard does not require

nylon cable and the use of the protective measures enumerated in the standard would have severely disrupted the respondent's work, it is improper to affirm the violation." Citations omitted.

To this I would add that expert evidence theorized that the use of nylon cable would create hazards not presently existing.

The dissenting Commission Chairman also said:

"What a standard assumes is irrelevant because the mere fact that the provisions of a standard have not been followed is not enough to establish a violation of the Act. There is no violation unless the evidence establishes that the respondent's employees were actually exposed to an unsafe working condition by the failure to comply with the standard." Citations omitted.

I agree with the Law Judge and with the dissenting Chairman of the Commission.