# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 18-60413

United States Court of Appeals
Fifth Circuit

**FILED**
June 5, 2019

Lyle W. Cayce
Clerk

CALPINE CORPORATION,

      Petitioner

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION; R. ALEXANDER ACOSTA, SECRETARY, DEPARTMENT OF LABOR,

      Respondents

Petition for Review of an Order of the
Occupational Safety and Health Review Commission
OSHRC No. 11-1734

Before HAYNES, GRAVES, and HO, Circuit Judges.

PER CURIAM:*

Calpine Corporation appeals the Occupational Safety and Health Review Commission's assessment of a $7,000 penalty for a violation of the Occupational Safety and Health Act.  We AFFIRM.

## I.   Background

Calpine Corporation owns and operates a power plant in Bethlehem,

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-60413

Pennsylvania. The power plant has electrical generators driven by turbines that are housed in various buildings throughout the plant. The Occupational Safety and Health Act (the "Act") violation at issue concerns the conditions in the CT-6 building. The CT-6 building has a combustion turbine and two combustion chambers—one east of the turbine, and one west of the turbine. The two chambers are surrounded by a walking platform, with a bridge connecting them. The platform is made of several removable steel grates and is approximately seventeen feet above the ground. The platform is accessible from the ground by climbing either the ladder at the east combustion chamber or the west combustion chamber.

In 2010, Calpine hired Siemens Energy, Inc. to overhaul the CT-6 turbine. Siemens disassembled portions of the catwalk and removed individual steel grates as part of the overhaul, leaving unguarded openings. These openings were present during the week of December 20, 2010. Siemens scheduled the December 21, 2010 day-shift crew to reassemble the platform and catwalk surrounding and connecting the CT-6 turbine. The task was not completed that day.

During that week, Siemens's crews worked two shifts in the CT-6 building: a day shift from 7:00 a.m. to 5:30 p.m., and a night shift from 5:00 p.m. to 3:30 a.m. Calpine crews also worked two shifts during this period: a day shift from 6:00 a.m. to 6:00 p.m., and a night shift from 6:00 p.m. to 6:00 a.m. Thus, from 3:30 a.m. to 7:00 a.m., Siemens's employees were absent while Calpine employees were performing their assigned tasks, including any in the CT-6 building.

Thomas Narkin, Calpine's operations manager, was responsible for managing seventeen maintenance employees, including four lead maintenance operators ("LMOs"). He assigned a CT-6 building task in a work order issued

2

for the week of December 20, 2010. The work assignment directed a Calpine employee to install a spark rod in one of the combustion chambers in the CT-6 building. Timothy Lewis, an LMO, started the spark rod assignment on December 21, 2010, at approximately 4:30 a.m. To install the spark rod in a chamber, one must climb up to the platform surrounding the combustion chambers via one of the two access ladders. Lewis testified that he did not know at the time which chamber required the spark rod and that the work order did not provide clarification. After observing several unguarded openings in the platform (left by the Siemens crew), Lewis determined the openings made walking on the platform unsafe and abandoned the work assignment. Lewis testified that he told Narkin and incoming shift LMO, Raymond Lutz, about the condition of the platform.

At 10:58 a.m. on December 21, 2010, Narkin issued another work order by e-mail, stating, "[I]f tarps and Siemens are not in the way, install new spark rod sitting on control room counter in CT-6 where one was 'borrowed' for CT-2 this past weekend." Raymond Rice and Roy Killgore, turbine engineers for a division of Calpine that provided technical oversight of Siemens's overhaul work, saw the Siemens's Shift Turnover Report indicating that Siemens had not finished replacing the grates in the CT-6 platform as of 5:00 p.m. on December 21, 2010.

As described above, Siemens employees would not be "in the way" for more than three hours in the early morning. Although tarps covered the combustion chambers on December 22, 2010, Lewis and Lutz both testified that tarps would not have prevented them (i.e., not been "in the way") from performing the assigned task because the tarps were attached to the top of the combustion chambers by bungee cords, and could be peeled back to permit the installation of the spark rod located near the edge of the tarp.

3

No. 18-60413

Early in the morning on December 22, 2010, the decedent (unnamed in the appellate materials), a Calpine LMO, was assigned to replace the spark rod in the CT-6 building. Surveillance video shows the decedent entered the CT-6 building at 3:32 a.m., after the Siemens's shift ended, with a spark rod in his pocket. Although the video did not capture which entrance the decedent used, Lutz testified that the decedent probably used the entrance closer to the west combustion chamber, the same entrance Lewis used the day before. The decedent's body was found in the CT-6 building beneath the catwalk between 5:00 a.m. and 5:30 a.m. The Occupational Safety and Health Administration ("OSHA") investigated the incident and cited Calpine for a serious violation of 29 C.F.R. § 1910.23(a)(7)(2010), which stated that "every temporary floor opening shall have standard railings, or shall be constantly attended by someone."[1]

In May 2013, an Administrative Law Judge ("ALJ") vacated the citation because the Secretary of Labor did not establish all four elements required to prove a violation under the Act. The ALJ held that (1) the cited standard applies; (2) the terms of the standard were violated; (3) the employer knew, or with the exercise of reasonable diligence could have known, of the violative condition, but held the Secretary had failed to prove that (4) Calpine employees were exposed or had access to the cited condition. The ALJ rejected Calpine's "unpreventable employee misconduct" and "multi-employer worksite" defenses. The Secretary appealed to the Occupational Safety and Health Review Commission (the "Commission"). In April 2018, the Commission affirmed the ALJ on the first three prongs and Calpine's affirmative defenses,

---

[1] Well after OSHA issued Calpine the citation, this OSHA regulation was revised in a rulemaking. The current version of the rule can be found at 29 C.F.R. §1910.28(b)(3)(i), and contains different language.

4

but held it was reasonably predictable that Calpine employees would be exposed to the platform opening "based on Narkin's continuing work order to install the spark rod near the top of CT-6." *Sec'y of Labor v. Calpine Corp.*, 2018 WL 1778958 at *3, (O.S.H.R.C. Apr. 6, 2018). The Commission further held the ALJ had erred in relying on factors that were not relevant to the exposure analysis, including the low priority of the assigned task, Calpine's safety training, the decedent's good safety record, and the obviousness of the hazard. *Id.* at *3–4. Thus, the Commission reversed the ALJ and assessed a $7,000 penalty. Calpine filed a timely petition for review. On appeal, Calpine argues the Commission erred with respect to the third and fourth prongs related to Calpine's knowledge and whether employees were exposed or had access to the condition at issue. Calpine also reiterates its unpreventable employee misconduct defense.

## II.    Jurisdiction & Standard of Review

We have jurisdiction under 29 U.S.C. § 660(a), which allows a party adversely affected by a final order from the Commission to seek review from the United States Court of Appeals in the circuit where the employer has its principal office. Calpine maintains its principal office in Houston, Texas.

The Commission's findings of fact must be accepted if supported by substantial evidence on the record considered as a whole. *Sanderson Farms, Inc. v. Perez*, 811 F.3d 730, 734 (5th Cir. 2016) (citations omitted). The standard "requires [us] to uphold factual findings if a reasonable person could have found what the Commission found, even if [we] might have reached a different conclusion." *Id.* (internal quotation marks omitted) (citations omitted). "Legal conclusions are reviewed for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Id.* at 734–35 (quoting *Austin Indus. Specialty Servs., LP. v. OSHCR*, 765 F.3d 434, 438–39 (5th Cir. 2014) (per curiam)).

No. 18-60413

"OSHA has the burden of proving sufficient facts to support the citation." *Id.* at 735 (citing *Champlin Petroleum Co. v. OSHRC*, 593 F.2d 637, 640 (5th Cir. 1979)). "The Secretary of Labor must show by a preponderance of the evidence: (1) that the cited standard applies; (2) noncompliance with the cited standard; (3) access or exposure to the violative conditions; and (4) that the employer had actual or constructive knowledge of the conditions through the exercise of reasonable due diligence." *Id.* at 735 (citing *Sec'y of Labor v. Jesse Remodeling*, LLC, 22 BNA OSHC 1340 (2006); *Sec'y of Labor v. Atlantic Battery Co.*, 16 BNA OSHC 2131 (1994)). The first element is not disputed.

## III.    Discussion

### A. Knowledge

Calpine first argues the Secretary did not establish that Calpine "knew of, or with exercise of reasonable diligence could have known of the non-complying condition." *Trinity Indus. Inc. v. OSHRC*, 206 F.3d 539, 542 (5th Cir. 2000). A supervisor's knowledge of a violative condition can be imputed to the employer. *See Sanderson*, 811 F.3d at 737. Here, as both the ALJ and the Commission noted, five supervisors including Narkin, Lutz, Lewis, Rice, and Killgore, all knew of the unguarded platform openings. *See Calpine Corp.*, 2018 WL 1778958 at *5. Specifically, Lewis and Lutz both testified that they had discussed the issue with Narkin.[2] *Id.* Killgore and Rice oversaw Siemens's work during the overhaul and were in the CT-6 building daily, and both reviewed the December 21, 2010 report that indicated Siemens had not

---

[2] Narkin testified that he was not told about the opening, but the ALJ credited Lewis's and Lutz's testimony. Specifically, the ALJ found "Narkin's denial was a 'convenient explanation for his inaction in not removing the spark rod replacement task from the night order or warning the deceased' of the opening, citing Narkin's 'defensive and unpersuasive' demeanor in testifying about this issue." *Calpine Corp.*, 2018 WL 1778958 at *5, (O.S.H.R.C. Apr. 6, 2018). Given that Lutz's and Lewis's testimony contradicted Narkin's and that Narkin re-issued the work order with the tarp caveat, a reasonable person could conclude as the ALJ did.

6

finished replacing the platform grates as of 5:00 p.m.  Calpine admits that "the record demonstrates that TMGs Rice and Killgore (as well as other Calpine employees) were aware that a temporary opening existed in the upper platform of CT-6 in the days prior to the decedent's accident."  Thus, the Commission did not act arbitrarily or capriciously when it held Calpine had knowledge of the unguarded platform opening.

Calpine cites *W.G. Yates & Sons Construction Co. v. OSHRC*, 459 F.3d 604, 607–08 (5th Cir. 2006), to argue that before knowledge can be imputed from a supervisor to the employer, the Secretary must prove that either (1) the employer's safety policy, training, and discipline are deficient or (2) that the supervisor's violation of a safety policy was foreseeable.  But *Yates* addresses only when a supervisor's knowledge of his *own* misconduct violates an employer's policy or instructions.  *See Yates*, 459 F.3d at 609 n.8 (noting that the case addressed only situations where the supervisor himself engages in unsafe conduct contrary to employer policy).  Calpine does not assert the failure to guard the platform opening arose from misconduct of any of its supervisors, making *Yates* inapplicable.

Calpine also argues that employers cannot be held liable "for the unforeseeable, implausible, and therefore unpreventable acts of [its] employees."  *Horne Plumbing & Heating Co. v. OSHRC*, 528 F.2d 564, 570–71 (5th Cir. 1976).  To support its argument, Calpine asserts that its extensive safety policy and the decedent's exemplary safety history illustrate implausibility.  But Calpine's argument is inapposite for multiple reasons.  First, in *Yates*, we interpreted *Horne* to address only situations when a supervisor's knowledge of his own misconduct is imputable to the employer.  *Yates*, 459 F.3d at 609.  Moreover, regardless of what caused the decedent's fall, the unguarded openings themselves would be a violation if employees were

No. 18-60413

exposed to or had access to them.  Calpine's awareness of the existence of a temporary floor opening that lacked guardrails or a permanent attendant (along with the other three prongs) is sufficient for OSHA to find a violation of the Act.  Finally, Calpine's foreseeability argument conflates the knowledge element with the exposure element of the four-part test.  But "reasonable predictability is relevant only to the element of exposure and not to the knowledge element." *Sec'y of Labor v. Phoenix Roofing, Inc.*, No. 90-2148, 1995 WL 82313 at *3 n.6 (O.S.H.R.C. Feb. 24, 1995) (internal quotation marks omitted), *aff'd sub nom. Phoenix Roofing, Inc. v. OSRHC*, 79 F.3d 1146 (5th Cir. 1996) (unpublished table decision).  Instead, "[e]mployer knowledge is established by a showing of employer awareness of the physical conditions constituting the violation." *Id.*

### B. Exposure

Calpine next argues there was no access or exposure to the violative condition.  To establish exposure, the Secretary must show that access to the cited condition was reasonably predictable.[3]  *Id.*  Reasonable predictability is established when "employees have been, are, or will be in the zone of danger," which may happen "while in the course of assigned working duties . . . or their normal means of ingress-egress to their assigned workplaces." *Calpine Corp.*, 2018 WL 1778958 at *3, (O.S.H.R.C. Apr. 6, 2018) (internal citations omitted); *see also Donovan v. Adams Steel Erection, Inc.*, 766 F.2d 804, 812 (3d Cir. 1985).

There is substantial evidence in the record to support the Commission's holding that "Calpine assigned its employees to complete a task that would bring them into the 'zone of danger' posed by the unguarded platform opening." *Calpine Corp.*, 2018 WL 1778958 at *4–5.  Narkin first assigned the work order

---

[3] The Secretary does not argue actual exposure.

to install the spark rod on December 20, 2010, and Lewis attempted to complete the task. The assigned task required going on the upper platform, which contained the unguarded openings. Despite knowing about Lewis's concerns, Narkin expressly reassigned the task in writing on December 21, 2010. As noted above, nothing in Narkin's work order prevented an employee from attempting the task because tarps could be peeled back to permit the installation of the spark rod located near the edge of the tarp and Siemens's employees were gone for several hours. In addition, the unguarded openings were closest to the west chamber ladder, which both Lutz and Lewis testified was the easier way to access the platform. In fact, Lewis did access the CT-6 building through the southwest access door closest to the west chamber when he attempted the task. Therefore, the Commission's conclusions regarding "access or exposure" were not arbitrary or capricious.

Calpine restates its argument before the ALJ that a "reasonably predictable" finding cannot be made without considering the low priority of the task in question, the conditional nature of the authorization to complete the task, Calpine's extensive safety policy, decedent's excellent safety record, and that the cited condition was obvious from ground level.

The Commission held that these arguments have no bearing on an exposure analysis. Calpine's first two points are contradicted by testimony from its own employees. Regardless of the priority of the task, work orders relayed "what needs to be done that night" and "listed things that need to be looked at that evening usually." Calpine employees understood orders tasks needed to be completed. One Calpine employee testified: "In hindsight there was no sense of urgency . . . But if you're told to do it, I mean, you know." Any task that was not completed during a night shift would roll over to the next shift's work order until it was completed. Calpine's priority argument is also

belied by the fact that the task was assigned multiple times and multiple employees attempted it.  As for authorization to complete the task, Lutz and Lewis both testified the tarps would not have prevented an employee from performing the task, making the caveat in Narkin's e-mail moot.

The remaining factors Calpine mentions may relate to its affirmative defense of employee misconduct but cannot be applied to the exposure analysis. This is because the Secretary did not rely upon *actual* exposure or argue that the decedent's death was caused by the unguarded platform opening.  Instead, the only relevant analysis for a violation of the Act and Calpine's citation is whether exposure to the opening was reasonably predictable.  Even if we gave full credit to Calpine's assertions that it had an extensive safety policy, that decedent had an excellent safety record, and that the cited condition was obvious from ground level, it would not change the facts showing employee exposure to the violative condition: the task to install the spark rod (which required accessing the unguarded open platform) was assigned multiple times, the easiest route to the platform was the west chamber, and the tarps in place did not prevent the completion of the task.  Thus, Calpine's arguments related to exposure are both inapplicable and unpersuasive.

## C. Unpreventable Employee Misconduct

Finally, Calpine argues that the Commission erred when it held the unpreventable employee misconduct defense was unavailable as a matter of law.  To establish that a violation was the result of unpreventable employee misconduct, Calpine must show it has (1) established work rules designed to prevent the violation, (2) adequately communicated these rules to its employees, (3) taken steps to discover violations, and (4) effectively enforced the rules when violations have been discovered.  *Yates*, 459 F.3d at 609 n.7. Calpine cannot establish the first prong, and once again conflates decedent's

No. 18-60413

accident with the violation of the Act—the unguarded platform opening. Calpine re-asserts the same arguments it did with respect to exposure, including that Calpine had well-implemented safety rules and that employees, including decedent, would be aware not to enter the upper platform in CT-6. This argument is inconsistent with the very terms of the work order that at least two employees construed as allowing the required work to be performed in the unguarded, unmanned opening. That itself is a violation even if it did not cause decedent's death. As the Secretary notes in his brief, "even strict compliance with Calpine's policy would not have prevented the violation."

For the reasons stated above, the Commission's decision is AFFIRMED.

11